IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

JOSE LUIS CHAVEZ-MACIEL,

Defendants.

CRIMINAL ACTION NO.
1:10-CR-00490-TCB-LTW

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS DEFENDANT READY FOR TRIAL

This matter is presently before the Court on the following motions from Defendant Jose Luis Chavez-Maciel ("Chavez-Maciel"): (1) Preliminary and Perfected Motions to Suppress Evidence and Statements, (Docket Entries [97, 102, 299]); (2) Preliminary Motion to Sever Defendants, (Docket Entry [100]); (3) Motion for Production of Name and Location of Confidential Informants, (Docket Entry [101]); (4) Preliminary and Perfected Motions to Suppress Intercepted Communications, (Docket Entries [103, 118]); (5) Preliminary and Perfected Motions to Suppress Evidence Resulting from Unlawful Search Warrants for Installation of GPS Tracking Device, (Docket Entries [105, 119]); and (6) Preliminary Motion to Suppress Identifications, (Docket Entry [107]).

For the reasons set forth below, the undersigned **RECOMMENDS** the following:

(1) Defendant Chavez-Maciel's Preliminary and Perfected Motions to Suppress Evidence and Statements be **GRANTED IN PART AND DENIED IN PART**, (Docket Entries [97, 102, 299]);

(2) Defendant Chavez-Maciel's Preliminary Motion to Sever Defendants be **DEFERRED** as to the <u>Bruton</u> issue and **DENIED** as to the antagonistic defenses argument, (Docket Entry [100]);

(3) Defendant Chavez-Maciel's Motion for Production of Name and Location of Confidential Informants be **DENIED**, (Docket Entry [101]);

(4) Defendant Chavez-Maciel's Preliminary and Perfected Motions to Suppress Intercepted Communications be **DENIED**, (Docket Entries [103, 118]);

(5) Defendant Chavez-Maciel's Preliminary and Perfected Motions to Suppress Evidence Resulting from Unlawful Search Warrants for Installation of GPS Tracking Device be **DENIED**, (Docket Entries [105, 119]); and

(6) Defendant Chavez-Maciel's Preliminary Motion to Suppress Identifications be **DEEMED ABANDONED** and **DENIED**, (Docket Entry [107]).

## DEFENDANT CHAVEZ-MACIEL'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

Chavez-Maciel seeks to suppress the unMirandized statements he made at the scene of his arrest and at the scene of the search of his home. Specifically, upon arrest, Chavez-Maciel admitted that people call him "Picho," and prior to the search of his

2

home, Chavez-Maciel disclosed that he had a firearm in his home. Chavez-Maciel also seeks to suppress the money, firearm, and papers that were discovered as a result of the search of his home because he contends the consents agents obtained from him and Ms. Vargas were not voluntary. Lastly, Chavez-Maciel seeks to suppress the post-arrest statements that he made to federal agents on the ground that he did not validly waive his Miranda rights.

# I.  FACTUAL BACKGROUND

On November 16, 2010, Special Agent Jeffrey Wagner ("SA Wagner") of United States Immigration and Customs Enforcement ("ICE) learned that Chavez-Maciel and some of his co-conspirators had become aware that law enforcement was investigating them, and they were planning to pack and hide. (Transcript of the January 9, 2012 Evidentiary Hearing ("Tr."), Docket Entry [295], 8-9, 145-46). Therefore, SA Wagner decided to seek and execute federal arrest warrants that evening for four of the targets of the investigation, including Chavez-Maciel. (Tr. 9). Four arrest teams were dispatched to execute the arrest warrants. (Tr. 9).

## A.  The Arrest of Chavez-Maciel

ICE Special Agent Alex Ascensio ("SA Ascensio") was the agent in charge of the team arresting Chavez-Maciel. (Tr. 9, 63). SA Ascensio executed the arrest warrant for Chavez-Maciel between six and six-thirty on the evening of November 16, 2010. (Tr. 64). SA Ascencio's arrest team identified Chavez-Maciel as he was driving a tan

3

Chevrolet Tahoe near the house where he lived at 3657 Spain Road in Gwinnett County. (Tr. 64-66). Someone from the arrest team, other than SA Ascencio asked the Gwinnett County Police Department to conduct a traffic stop of the Tahoe. (Tr. 64, 100). When the Gwinnett County officer arrived on the scene, he activated his blue lights and sirens and stopped the vehicle Chavez-Maciel was driving. (Tr. 64, 97-98). Although the Gwinnett County officer initiated the traffic stop, federal agents took over once Chavez-Maciel's vehicle was stopped. (Tr. 66, 97). There were between five and six law enforcement officers at the scene of arrest. (Tr. 161; see also Tr. 97-98).

Chavez-Maciel was in the driver's seat, and his common law wife or girlfriend, Naomi Vargas, was in the passenger's seat. (Tr. 68, 101-02). There were two young children also in the vehicle. (Tr. 101). A man later identified as Ms. Vargas's father also was present in the vehicle. (Tr. 65, 153). SA Ascencio, with weapon drawn and pointed at Chavez-Maciel, brought Chavez-Maciel out of the Tahoe to the ground, searched him, and then handcuffed him behind his back. (Tr. 66, 98-99, 101-02).

Upon arresting Chavez-Maciel, SA Ascencio first "asked him what his name was." (Tr. 66, 105). Chavez-Maciel replied, "Jose Luis Chavez-Maciel." (Tr. 66). SA Ascencio also asked "if he had any other names that [he went] by," and Chavez-Maciel replied, "Yes, people call me Picho." (Tr. 66, 105). Although SA Ascencio had seen Chavez-Maciel during previous surveillances, had heard his voice, and knew his nickname, Chavez-Maciel's arrest was the "first time [SA Ascencio] saw him where [he]

4

verified it was him." (Tr. 93, 95-96). SA Ascencio did not ask any further questions of Chavez-Maciel at the scene of the arrest, but placed him in the rear seat of a marked police vehicle for about twenty-five to thirty minutes while agents searched the Tahoe and processed the arrest scene. (Tr. 66-67). SA Ascencio did not Mirandize Chavez-Maciel at the arrest scene. (Tr. 105).

### B. The Search of Chavez-Maciel's Home

Agents searched the Tahoe, but did not find anything. (Tr. 102, 107). Unsure of the identity of the other adult man riding in the Tahoe or his possible connection to the criminal investigation of Chavez-Maciel, agents also took him (Ms. Vargas's father) into custody and placed him in a separate, marked police vehicle. (Tr. 70, 102-03).

SA Ascencio began by talking with Ms. Vargas. (Tr. 67-69). SA Ascencio talked with Ms. Vargas "initially just identifying her, trying to find out her status in the United States, trying to figure out the children. And also talking to her about Mr. Chavez, how she knew him, very briefly and the gentleman that was in the vehicle with him."[1] (Tr. 68-69). SA Ascencio also questioned Mr. Vargas about his immigration status. (Tr. 69). Neither Mr. Vargas or Ms. Vargas were questioned about the criminal investigation that led to Chavez-Maciel's arrest. (Tr. 69-70).

Approximately forty-five minutes after Chavez-Maciel's arrest, everyone from the

---

[1] At this time, SA Ascencio deemed Ms. Vargas to be "investigationally detained." (Tr. 109-10).

5

Tahoe was transported to Chavez-Maciel's residence at 3657 Spain Road. (Tr. 69-70). Marked units transported Mr. Vargas and Chavez-Maciel back to the residence. (Tr. 70). With Ms. Vargas's permission, SA Ascencio drove her and the children to the residence in the Tahoe. (Tr. 70). During the drive, SA Ascencio attempted to calm Ms. Vargas as she was upset after the arrest of Chavez-Maciel and worried about her father. (Tr. 108, 161). The conversation began in a very "polite," "nonchalant" manner. (Tr. 108). SA Ascencio "began talking to [Ms. Vargas], trying to get some rapport built up." (Tr. 108). SA Ascencio asked Ms. Vargas about the children. (Tr. 110). SA Ascencio also asked Ms. Vargas whether she lived in the house located at 3657 Spain Road and whether there were other adults or dogs in the house. (Tr. 70). Ms. Vargas confirmed that she did live in the house at 3657 Spain Road, she was the actual lessee, and no one else was inside the house at that point. (Tr. 70-71, 110-11). Ms. Vargas told SA Ascencio that Chavez-Maciel also lived in the house. (Tr. 113). SA Ascencio asked for and verbally received permission from Ms. Vargas to conduct a security sweep of the house. (Tr. 70, 111). SA Ascencio did not perceive Ms. Vargas to be fearful; "on the contrary, [Ms. Vargas] wanted to talk." (Tr. 146). Ms. Vargas appeared to be coherent. (Tr. 146).

Once at 3657 Spain Road, the number of agents and officers present increased by at least two to three, and the number of law enforcement vehicles increased by at least two. (Tr. 114). There were at least three law enforcement (marked and unmarked)

6

vehicles in the driveway. (Tr. 115). Although additional law enforcement personnel did arrive to participate in the search, no one drew weapons at the house. (Tr. 114). Ms. Vargas used her key to open the door to the home. (Tr. 116). While SA Ascencio waited outside the door with Ms. Vargas and the children, three or four other agents conducted the security sweep. (Tr. 116-17). A "few minutes" later (tr. 118), the security sweep was complete, with no one and nothing being found. (Tr. 117-18). At that point, SA Ascencio, Ms. Vargas, and the children entered the living room of the house. (Tr. 116, 118). Once inside, SA Ascencio asked Ms. Vargas for her consent to search the premises, including three automobiles. (Tr. 71-72, 118-19).

SA Ascencio explained to Ms. Vargas that he wanted to search the house for contraband, such as money, drugs, and weapons. (Tr. 119, 121). SA Ascencio presented a typewritten consent form, written in English,[2] that he translated, read, and explained to Ms. Vargas in Spanish. (Tr. 73-74, 121). The consent form covered the house and three vehicles. (Tr. 75). After doing so, SA Ascencio "was comfortable [Ms. Vargas] understood what she was signing, and she had no issue with [the agents] searching her house." (Tr. 73). SA Ascencio asked Ms. Vargas if she had any questions and "she was completely cooperative, she said, no, search the house, there is nothing here." (Tr. 74). Ms. Vargas signed the consent form where SA Ascencio showed her to sign. (Tr. 74;

---

[2] SA Ascencio did not have a Spanish version of the form available at the scene. (Tr. 73, 118).

7

Gov't Ex. 5). SA Bruce Busby from Homeland Security Investigation was present with SA Ascencio when Ms. Vargas gave her consent, and SA Busby saw Ms. Vargas sign the consent form. (Tr. 156-57). No one implied to Ms. Vargas that a decision on whether she would be deported from the United States might hinge on her giving her consent to search. (Tr. 159).

After receiving Ms. Vargas's written consent to search the premises, SA Ascencio exited the house and approached Chavez-Maciel in the police car. (Tr. 122). SA Ascencio told Chavez-Maciel that Ms. Vargas had given her written consent to search the premises, and SA Ascencio asked Chavez-Maciel to give his consent as well. (Tr. 76, 122-23). Chavez-Maciel responded by giving his verbal consent at about 7:23 p.m., approximately one hour after his arrest. (Tr. 76-77, 125). According to SA Busby, who witnessed the consent, SA Ascencio explained the standard written consent form to Chavez-Maciel, who "was very cooperative," and told the agents, "sure you can search the house." (Tr. 154). Although the consent form was written in English, SA Ascencio spoke to Chavez-Maciel in Spanish when he explained the form. (Tr. 155, 157). No threats or promises were made in connection with obtaining the consents from Chavez-Maciel or Ms. Vargas. (Tr. 146-47, 158). SA Ascencio noted Chavez-Maciel's consent to the search on the consent form.[3] (Tr. 76; Gov't Ex. 5).

---

[3] SA Ascencio did not have an extra, blank consent form readily available. (Tr. 124). If SA Ascencio had had an extra consent form, he would have asked Chavez-

8

Before searching the house, SA Ascencio asked Chavez-Maciel whether he would like to tell him in advance about anything that was in the house. (Tr. 76). This was SA Ascencio's "usual spi[el], [and was intended to include] weapons, drugs, money, anything." (Tr. 76-77). Chavez-Maciel replied that he kept a gun beside his bed in the bedroom to use on rats. (Tr. 76-77, 125-26, 154-55, 162). There is no indication in the record that SA Ascencio Mirandized Chavez-Maciel before Chavez-Maciel gave his answer about the firearm.

After obtaining consents from Ms. Vargas and Chavez-Maciel, law enforcement personnel conducted a search of the home and three vehicles, which lasted approximately thirty to forty-five minutes. (Tr. 126, 158-59). The search included the use of a trained police dog to sniff the house and the vehicles for drugs. (Tr. 78). As a result of the search, agents seized the firearm, "some phones, miscellaneous documents, [and] a little bit of currency . . . was retrieved from one of the vehicles." (Tr. 78, 127). Specifically, $1,200.00 was recovered from "inside a center console that . . . had been dismantled several times. It was loose from it being popped on and off."[4] (Tr. 78). Although agents spent no more than thirty to forty-five minutes searching the house itself, they were at the 3657 Spain Road address for "an hour and a half, maybe two hours." (Tr. 77). After the search was completed, SA Busby released Ms. Vargas at the

---

Maciel to sign the form, like Ms. Vargas. (Tr. 124-25).

[4] According to SA Asencio, this removable console area was a "trap," or a "natural void where they were hiding money." (Tr. 127).

residence on her own recognizance. (Tr. 79, 115). At about 9:30 p.m., Chavez-Maciel and Mr. Vargas were transported to the office of the ICE Special Agent in Charge, arriving at approximately 10:00 p.m. (Tr. 79, 127).

## C. **Chavez-Maciel's Interview with Agents**

SA Wagner, who was the "case agent," (tr. 8), and SA Ascensio participated in the post-arrest interview of Chavez-Maciel. (Tr. 10, 14-15). Chavez-Maciel was the third of the four arrestees to be interviewed.[5] (Tr. 10-14). For about an hour before the interview began, Chavez-Maciel was confined to a standard holding cell with normal lighting, an angled bench, a toilet, and a sink. (Tr. 19-20). When the interview began soon after midnight on November 17, 2010, Chavez-Maciel appeared to be awake and coherent. (Tr. 29, 32, 88). SA Wagner did not know whether or not Chavez-Maciel had had anything to eat between the time he was arrested and the time he was questioned. (Tr. 33).

During the interview, Chavez-Maciel and the two agents sat around a small, round table that was between three to four feet in diameter. (Tr. 18). SA Wagner sat directly across from Chavez-Maciel and SA Ascensio a little closer to Chavez-Maciel so that he could communicate with him. (Tr. 19). The room was approximately eight by ten feet or ten by ten feet. (Tr. 19). SA Wagner did not recall whether there were any windows in the room, but there was bright fluorescent lighting. (Tr. 19). Chavez-Maciel was not restrained in any way (tr. 23); neither of the agents was armed, (tr. 19, 92), and neither

---

[5] SA Wagner participated in all four arrestees' interviews. (Tr. 10).

agent threatened Chavez-Maciel in any way. (Tr. 21). The interview was conducted in Spanish with SA Ascensio, a native Spanish speaker, interpreting English into Spanish and Spanish into English.[6] (Tr. 15-16, 62-63, 82-83). The interview lasted between forty-five and seventy-five minutes, (tr. 17, 87), and both SA's Wagner and Ascencio were present with Chavez-Maciel the entire time. (Tr. 21-22). There was no facility for videotaping in the interview room. (Tr. 143).

At the outset of the interview, SA Wagner witnessed SA Ascencio explain the Miranda rights to Chavez-Maciel. (Tr. 17, 131). SA Ascencio went through a pre-printed Miranda rights form, written in Spanish, with Chavez-Maciel line by line. (Tr. 17-18, 24, 131; Gov't Ex. 1). Chavez-Maciel signified his understanding of the Miranda rights by initialing every item on the form and signing the form. (Tr. 17-18, 24, 36; Gov't Ex. 1). SA Wagner knows enough Spanish to be able to understand the exchange between SA Ascencio and Chavez-Maciel about the Miranda rights, without need of any translation. (Tr. 18). SA Wagner could not recall whether Chavez-Maciel asked any questions about the right to an attorney. (Tr. 36). SA Ascencio testified that Chavez-Maciel had no questions about his Miranda rights, which he appeared to understand, "basically the first time we went through them." (Tr. 86). Chavez-Maciel appeared to be in control of his faculties and in his right mind. (Tr. 21). Once the Miranda rights were explained, Chavez-Maciel simply "started talking to [the agents] about what [they]

---

[6] SA Wagner speaks "some Spanish," but not enough to feel comfortable conducting a complete, thorough interview alone. (Tr. 15).

11

were asking. (Tr. 86). Chavez-Maciel did raise a concern about Ms. Vargas while he and SA Ascencio were going through the <u>Miranda</u> rights form. (Tr. 88, 131). SA Ascencio told Mr. Chavez that if they started talking about her, and he did not want to have that conversation, then they could stop. (Tr. 88).

According to SA Wagner, Chavez-Maciel naturally appeared "concerned," and said[7] that he feared persons involved in the drug trafficking organization. (Tr. 20-21, 43). Chavez-Maciel talked about his brother having been murdered. (Tr. 44). Chavez-Maciel asked if the agents would protect him and his family if he were to cooperate with them. (Tr. 22). The issue of protection arose after Chavez-Maciel outlined his involvement with the drug trafficking organization and explained that they are dangerous people, not in connection with the possibility of Chavez-Maciel cooperating with the agents. (Tr. 39-40, 133). Chavez-Maciel said that he wanted to cooperate, but was fearful of the implications for him and his family. (Tr. 40). SA Wagner assured Chavez-Maciel that the agents would do everything in their power to keep him and his family safe. (Tr. 22, 39).

The agents explained the serious nature of the charges pending against him, and the notion of cooperating with law enforcement was presented as a way of mitigating his potential sentence. (Tr. 41-42, 133). At no time did Chavez-Maciel request that the agents stop asking questions, nor did he tell them that he did not wish to answer any

---

[7] During the interview Chavez-Maciel spoke to SA Wagner through SA Ascencio, who acted as an interpreter, but SA Wagner could understand at least half of what Chavez-Maciel said in Spanish. (Tr. 20-21).

12

more questions, he was too tired to answer any further questions, or he did not understand a question. (Tr. 22, 87-88). At no time during the interview did Chavez-Maciel make any reference to desiring an attorney. (Tr. 22, 45, 87, 132). Had Chavez-Maciel made any such reference, the agents would have terminated the interview. (Tr. 37, 45).[8] SA Ascencio had no reason to believe that Chavez-Maciel's statement to him and SA Wagner was anything but voluntary. (Tr. 88).

## II. LEGAL ANALYSIS

### A. The Federal Agents Received Proper Consent to Search the Residence at 3657 Spain Road

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (internal citations omitted). An exception to the requirement that law enforcement obtain a warrant to search a person's residence is when consent is given by an individual possessing authority to do so. Georgia v. Randolph, 547 U.S. 103, 109 (2006). A third party may give valid consent to search if he or she has "common authority over or other sufficient relationship to the

---

[8] Agents terminated the interview of David Quinones-Sanchez, one of the other four arrestees that night and a co-defendant, after he mentioned that he wanted to speak with an attorney. (Tr. 13, 45).

13

premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171 (1974). Common authority is not implied from the mere property interest a third party has in the property, "but rests rather on mutual use of the property by persons generally having joint access or control for most purposes." Id. at 172 n. 7. "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir. 1995) (internal quotation marks and citations omitted). Ultimately, the burden is on the government to prove the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority, but rather was given freely and voluntarily. United States v. Hidalgo, 7 F.3d 1566, 1571 (11th Cir. 1993) (internal citations omitted).

To determine whether a particular consent to search was voluntary, the Court must examine the totality of the circumstances. Tovar-Rico, 61 F. 3d at 1535. In the Eleventh Circuit, the following factors are considered in assessing voluntariness: the defendant's custodial status, the presence or absence of coercive police procedures, the extent of the consenting's party's cooperation with law enforcement, the consenting party's awareness of his or her right to refuse consent, the consenting party's education and intelligence, and the consenting party's belief that no incriminating evidence will be found. United States v. Blake, 888 F.2d 795, 798-99 (11th Cir. 1989). Although consent may not be coerced, there is no requirement that the government show that consent amounted to an intentional relinquishment of a known right or privilege. Tukes v. Dugger, 911 F.2d 508, 516 (11th Cir. 1990) (internal citations omitted). Similarly,

the government is not required to inform a suspect that he or she has the right to refuse consent. United States v. Pineiro, 389 F.3d 1359, 1366 n.4 (11th Cir. 2004).

          1.    Ms. Vargas's Consent for the Protective Sweep Was Freely and Voluntarily Given

The Government has met its burden for demonstrating that Ms. Vargas gave her uncoerced consent to the security sweep of the residence at 3657 Spain Road. To begin, there is no dispute that Ms. Vargas had the authority to consent to the protective sweep of the residence at 3657 Spain Road, as she resided there and claimed to be the lessee for the residence. Chavez-Maciel makes no argument that Ms. Vargas's consent to the protective sweep was not voluntary. Instead, Chavez-Maciel argues the Government has not demonstrated the justification for the security sweep. However, a justification for the security sweep was not necessary because Ms. Vargas verbally gave her consent for the agents to conduct a security sweep. See United States v. DeGaule, 797 F. Supp. 2d 1332, 1373 (N.D. Ga. 2011) (arrestee voluntarily consented to arresting officers entering his home and conducting a security sweep).

Moreover, considering the totality of the circumstances, as this Court is required to do, the Government has met its burden of demonstrating that Ms. Vargas voluntarily gave her consent for the protective sweep. Ms. Vargas consented to the security sweep during the drive back to her residence at 3657 Spain Road in the Tahoe, a vehicle with which she was familiar. Although SA Ascencio deemed Ms. Vargas to be administratively detained because of her immigration status, there is no evidence in the

record that suggests SA Ascencio communicated to Ms. Vargas that she was being restricted in any way. Ms. Vargas was never placed in handcuffs that evening, nor was any firearm pointed at her. SA Ascencio, a native Spanish-speaker, spoke to Ms. Vargas in Spanish. SA Ascencio described the conversation in which Ms. Vargas gave her consent as "polite" and "nonchalant." SA Ascencio did not perceive Ms. Vargas to be fearful when she gave her consent. In response to SA Ascencio's question about whether there were any other adults or dogs at the 3657 Spain Road residence, Ms. Vargas said that no one else was inside the house. Therefore, it is unlikely that Ms. Vargas feared that the agents would discover anyone else in her home when the agents conducted the security sweep. When SA Ascencio, Ms. Vargas, and the children arrived at 3657 Spain Road, Ms. Vargas used her key to open the door so that the agents could conduct the security sweep. The agents did not find any other adults in the residence during the sweep. Considering these facts together, the Court concludes that Ms. Vargas's consent to the security sweep was uncoerced and voluntary.

2.   Ms. Vargas's and Chavez-Maciel's Consent for the Search of 3657 Spain Road Was Freely and Voluntarily Given

The Government also has met its burden of demonstrating that Ms. Vargas and Chavez-Maciel each voluntarily consented to the search of the residence located at 3657 Spain Road. As noted above, there is no dispute that Ms. Vargas resided at 3657 Spain Road, and therefore had the authority to consent to a search of the residence. Likewise, there is also no dispute that Chavez-Maciel resided at 3657 Spain Road, and therefore

16

had the authority to consent to a search of the residence.

After the agents conducted the security sweep, SA Ascencio asked Ms. Vargas for her consent to search the residence and three vehicles at 3657 Spain Road. SA Ascencio spoke to Ms. Vargas about obtaining her consent after they had entered the living room of the residence, an environment in which she was undoubtedly familiar. SA Ascencio explained that the search would be for contraband, such as drugs, weapons, and money. Ms. Vargas was cooperative and agreed to allow the agents to search the residence, saying "[S]earch the house, there is nothing here." (Tr. 73). SA Ascencio presented a consent to search form to Ms. Vargas to sign. Although the form was in English, SA Ascencio translated, read, and explained the form to Ms. Vargas. Ms. Vargas signed the consent form while SA Busby watched. Neither SA Ascencio nor SA Busby threatened Ms. Vargas in order to obtain her consent. In addition, no one implied to Ms. Vargas that a decision on whether or not she would be deported was or may be contingent upon whether she consented to the search. None of the agents or officers at the residence drew their weapons. Because there is no evidence of coercion or intimidation, this Court concludes that the totality of the circumstances demonstrate Ms. Vargas's consent to the search of her residence was voluntarily given.

Likewise, Chavez-Maciel's consent to the search of 3657 Spain Road was voluntarily given. Chavez-Maciel only argues that his consent was involuntary because it was tainted by the coercion of Ms. Vargas's consent. However, as discussed above, this Court does not find that Ms. Vargas's consent was coerced. Furthermore, the

17

totality of the circumstances show that Chavez-Maciel's consent, too, was voluntarily obtained. After obtaining Ms. Vargas's consent, SA Ascencio approached Chavez-Maciel and told him that Ms. Vargas had given her written consent to search the premises. SA Ascencio explained the same consent form that Ms. Vargas signed to Chavez-Maciel. Chavez-Maciel "was very cooperative" and told the agents, "sure , you can search the house." (Tr. 154). No threats were made in connection with obtaining Chavez-Maciel's consent. None of the agents or officers drew their weapons while at the residence. Although Chavez-Maciel was still under arrest and waiting in a police car at the time SA Ascencio approached him for his consent, this fact alone does not undermine the voluntariness of the consent. Indeed, the Eleventh Circuit has found consent to be voluntary under circumstances that were more coercive than the circumstances present here. See, e.g., United States v. Espinosa-Orlando, 704 F.2d 507, 512-13 (11th Cir. 1993) (finding consent to search car was voluntary where the defendant was arrested by four agents near his car at gun point, forced to lie on the grass near the roadway and gave consent while lying down because there was no abusive language used and no threats, the request was made in a conversational tone, and the defendant was not handcuffed or removed from the scene of the stop); cf. Hidalgo, 7 F.3d at 1571 (finding consent was voluntary where the defendant had been "arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint" and defendant had invoked his right to remain silent before consenting to the search); United States v. Garcia, 890 F.2d 355, 360-62

18

(11th Cir. 1989) (finding consent to search voluntary where fourteen agents were present during defendant's arrest, the defendant was patted down for weapons, the officers performed a protective sweep of his house, the officers placed the defendant in handcuffs, the officers gave the defendant his Miranda rights, and the officers refused to accept a limited consent, saying that they would have to secure the house and apply for a search warrant). Therefore, the Court concludes that Chavez-Maciel's consent was uncoerced and voluntarily.

Because the agents' search of the residence and the vehicle was based on voluntary consents from Chavez-Maciel and Ms. Vargas, the undersigned **RECOMMENDS** that Defendant Chavez-Maciel's Motion to Suppress the evidence agents recovered as a result of the search of the residence and vehicles at 3657 Spain Road be **DENIED**, and the evidence **ADMITTED**.

### B. Chavez-Maciel's Statement at the Scene of His Arrest Was Improperly Obtained and Should Be Inadmissible

Chavez-Maciel argues that his statement upon arrest that people call him "Picho" was unMirandized and therefore inadmissible. The Government counters that a request for basic identification information, such as one's name and any alias, is excepted from Miranda protections under the Muniz routine booking exception. In reply, Chavez-Maciel further argues that the routine booking exception is inapplicable here because the agent conceded that he was not booking Chavez-Maciel at the time the statement was made.

19

The Self-Incrimination Clause of the Fifth Amendment protects an accused from being compelled to testify against himself, or otherwise provide the state with evidence of a testimonial or communicative nature. Pennsylvania v. Muniz, 496 U.S. 582, 588-89 (1990). In Miranda v. Arizona, 384 U.S. 436 (1966), the United States Supreme Court concluded that in the context of custodial interrogations, certain procedural safeguards are necessary to protect a defendant's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination. Rhode Island v. Innis, 446 U.S. 291, 297 (1980). Miranda "warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) (internal quotation marks and citations omitted).

The safeguards of Miranda come into play "whenever a person in custody is subjected to either express questioning or its functional equivalent." Innis, 446 U.S. at 300-01. The term interrogation therefore includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301. Although the Government bears the burden of establishing that a defendant's in-custody statements were obtained in compliance with the dictates of Miranda and were given voluntarily, United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1978)[9],

---

[9] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to October 1, 1981.

AO 72A
(Rev.8/82)

the defendant bears the burden of establishing that he was in custody when his statements were made and that they were made in response to government interrogation, United States v. Mwangi, No. 1:09–CR–107–TWT, 2010 WL 520793, at *6 (N.D. Ga. Feb. 5, 2010). United States v. Asher, No. 1:09-CR-414-JOF/AJB, 2010 WL 4192883, at *7 (N.D. Ga. Feb. 25, 2010).

The Supreme Court and the Eleventh Circuit have recognized a "routine booking question exception" which exempts from Miranda's coverage questions to secure "biographical data necessary to complete booking or pretrial services." Muniz, 496 U.S. at 601; United States v. Sweeting, 933 F.2d 962, 965 (11th Cir. 1991). Law enforcement's questions regarding an individual's name, address, height, weight, eye color, date of birth, and age fall within the routine booking question exception. Muniz, 496 U.S. at 601. In the Muniz court's view, such questions are "reasonably related to the police's administrative concerns," and therefore fall outside Miranda's protections. Id. at 601-02. Notwithstanding the booking exception, police may not ask questions, even during booking, that are designed to elicit incriminatory admissions. Muniz, 496 U.S. at 602 n.14. As the Eleventh Circuit Court of Appeals explained in United States v. Glen-Archila, 677 F.2d 809 (11th Cir. 1982):

> We emphasize that police may not use routine biographical questioning as a guise for obtaining incriminating information. If investigative questions are asked while routine information is being obtained-as apparently were asked in this case-answers to such questions are inadmissible if the suspect has not been read his Miranda rights. Even questions that usually are routine must be proceeded by Miranda warnings if they are intended to produce answers that are incriminating.

21

Id. at 816 n.18 (internal citation omitted).

Applying the law to the facts of this case, this Court concludes that Chavez-Maciel should have been given <u>Miranda</u> warnings prior to answering SA Ascencio's question about his aliases. Upon arresting Chavez-Maciel, SA Ascencio asked Chavez-Maciel his name. Chavez-Maciel responded by providing his full name (Jose Luis Chavez-Maciel). SA Ascencio followed up and asked if Chavez-Maciel had any other names that he "go[es] by." (Tr. 66). Chavez-Maciel responded, "Yes, people call me Picho." (Tr. 66). Chavez-Maciel had not received any <u>Miranda</u> warnings at the time he provided this answer. SA Ascencio explained his reason for asking about Chavez-Maciel's aliases: although he had been involved in the investigation of Chavez-Maciel and knew what he looked like, knew what he sounded like, and knew his nickname, the traffic stop was the first instance in which SA Ascencio was able verify Chavez-Maciel's identity. Thus, on its face, it would appear that SA Ascencio's question about any aliases for Chavez-Maciel amounts to an inquiry directed at obtaining background information pursuant to the booking exception. However, as Chavez-Maciel argues, SA Ascencio admitted that he was not booking Chavez-Maciel at the time he asked him about his aliases. Indeed, SA Ascencio testified that after the agents finished the investigation at the 3657 Spain Road residence, the agents were going to "take everybody back to the office to be processed and get all of the biographical information." (Tr. 106). Based on this testimony, this Court is left to conclude that SA

22

Ascencio's question about Chavez-Maciel's aliases was for interrogation purposes, not for administrative or booking purposes. Because Chavez-Maciel made the statement that "people call him Picho" without the appropriate _Miranda_ warnings, the undersigned **RECOMMENDS** that Defendant Chavez-Maciel's request to suppress this statement be **GRANTED**, and this statement be **SUPPRESSED**.

### C.    Chavez-Maciel's Statement at the Scene of the Search of His Residence Also Was Improper and Should be Inadmissible

Chavez-Maciel argues that his statement to SA Ascencio about the presence of a firearm in his bedroom should be suppressed because he had not been Mirandized at that point, and because SA Ascencio's question did not fall within the public safety exception to _Miranda_ as there was no objectively reasonable basis for any concern for the public or the officers' safety.

In addition to the booking exception, "[t]he Supreme Court has recognized a 'public safety' exception to the _Miranda_ rule, under which police may question a suspect before giving _Miranda_ warnings when the questioning is necessary to protect the officers' safety or the safety of the general public." _United States v. Durrah_, 384 F. App'x 970, 972 (11th Cir. 2010) (citing _New York v. Quarles_, 467 U.S. 649 (1984)). "When the danger inherent in a confrontation has passed, so has the basis for the [public safety] exception." _Fleming v. Collins_, 954 F.2d 1109, 1114 (5th Cir. 1992).

The parties do not dispute that at the time SA Ascencio asked Chavez-Maciel about the existence of any contraband in the residence, such as a firearm, Chavez-Maciel

23

was under arrest and in custody. Agents had already conducted a security sweep, and agents were with Ms. Vargas and the children in the residence. The only other adult present on the scene, Mr. Vargas, also was under arrest and in custody. Thus, any threat to the public or the officers based on the fact that a weapon was in the residence and could be used by someone was neutralized. The Government does not articulate any threat that SA Ascencio's inquiry about contraband, including firearms, was designed to address. Furthermore, although SA Ascencio's question to Chavez-Maciel about whether he wanted to tell SA Ascencio about anything in the residence would not technically call for an incriminating response, as the Government argues, the import of his question, as Chavez-Maciel clearly understood, was to solicit a response about any contraband that may have been in the residence. Therefore, because Chavez-Maciel disclosed the existence of a firearm in the residence without having received Miranda warnings, the undersigned **RECOMMENDS** that Defendant Chavez-Maciel's request to suppress this statement be **GRANTED**, and this statement be **SUPPRESSED**. See United States v. Braithwaite, 458 F.3d 376, 382 n.8 (5th Cir. 2006) (concluding that public safety exception did not apply when the police had already conducted two protective sweeps of the premises and both occupants of the house, including defendant, were in handcuffs, but the police failed to Mirandize defendant before asking him about the presence of firearms).

### D. Chavez-Maciel's Post-Arrest Statements to Agents Were Properly Mirandized

The Fifth Amendment of the United States Constitution prohibits the use of an involuntary confession against a defendant in a federal criminal trial. U.S. Const. amend. V; Dickerson v. United States, 530 U.S. 428, 433 (2000); Bram v. United States, 168 U.S. 532, 542 (1897). In Miranda, the Supreme Court recognized the need to further safeguard the privilege against self-incrimination by requiring that Miranda warnings, or other fully effective means, be given to subjects of custodial interrogations. Miranda, 384 U.S. at 478-79; see also Dickerson, 530 U.S. at 442-43 (rejecting Congress's attempt through 18 U.S.C. § 3501 to reinstate the totality test as sufficient). The "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Innis, 446 U.S. at 300-01. A defendant may waive his Miranda rights "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444. The waiver inquiry is two-pronged. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish

25

waiver." <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979); <u>see also</u> <u>United States v.</u> <u>Beckles</u>, 565 F.3d 832, 840 (11th Cir. 2009) (same).

Chavez-Maciel's waiver of his <u>Miranda</u> rights meets both prongs of the inquiry. First, Chavez-Maciel's waiver was voluntary. Chavez-Maciel was not restrained during his interview with SA's Wagner and Ascencio. Neither of the agents were armed, nor did they threaten Chavez-Maciel in any way. SA Ascencio, a native Spanish speaker, conducted the interview with Chavez-Maciel in Spanish, and he translated English into Spanish and Spanish into English. The entire interview lasted between forty-five and seventy-five minutes. At no time did Chavez-Maciel request that the agents stop asking questions nor did he indicate that he did not wish to answer any additional questions. The record is devoid of any evidence of intimidation or coercion on behalf of either SA Wagner or SA Ascencio. In fact, as SA Ascencio discussed the waiver with Chavez-Maciel, Chavez-Maciel raised concerns about discussing Ms. Vargas. SA Ascencio agreed that they did not have to talk about her as part of the interview. Also illustrative of the nature of the interviews that evening, David Quinones-Sanchez, one of Chavez-Maciel's co-defendants, decided that he wished to speak to an attorney rather than the agents. Once Quinones-Sanchez mentioned an attorney, the agents terminated the interview. Quinones-Sanchez was interviewed before Chavez-Maciel.

Second, Defendant's waiver was knowing and intelligent. When Chavez-Maciel's interview with SA's Wagner and Ascencio began, Chavez-Maciel appeared to be awake and coherent. SA Ascencio reviewed a pre-printed <u>Miranda</u> form in Spanish, line by

line with Chavez-Maciel. At that time, Chavez-Maciel indicated his understanding of the waiver of his rights by initialing every item on the form and signing the bottom of the form. Chavez-Maciel appeared to be in his right mind and in control of his faculties. According to SA Ascencio, Chavez-Maciel appeared to understand his Miranda rights "basically the first time we went through them." (Tr.86). Once the Miranda rights were explained, Chavez-Maciel "started talking to [the agents] about what [they] were asking." (Tr. 86).

Chavez-Maciel argues that the waiver of his Miranda rights was not free from coercive influences because he was concerned about his safety and the safety of his family. In support, Chavez-Maciel relies on United States v. Beale, 921 F.2d 1412, 1435 (11th Cir. 1991), a case in which the Eleventh Circuit found that the defendant's Miranda waiver was not valid because the agents told him that making a statement would not hurt him. However, unlike Beale, neither SA Wagner nor SA Ascencio told Chavez-Maciel that making a statement would not hurt him. The agents explained the serious nature of the charges pending against Chavez-Maciel and discussed the idea of cooperation with law enforcement as a way of mitigating his potential sentence, not as a way of avoiding any punishment entirely. Furthermore, Chavez-Maciel did not raise the concern about his safety in connection with the waiver of Miranda rights, but instead raised this concern towards the end of the interview, after he had waived his Miranda rights and made a lengthy statement to the agents about his involvement with the drug trafficking organization. Although the agents told Chavez-Maciel they would do

27

everything they could to keep him and his family safe, there is no evidence in the record that either agent promised Chavez-Maciel or his family any physical protection in exchange for his statements.

Accordingly, the Court concludes that the record evidence establishes that Chavez-Maciel voluntarily, knowingly, and intelligently waived his <u>Miranda</u> rights in an express written waiver. Thus, the undersigned **RECOMMENDS** that Defendant Chavez-Maciel's request to suppress his post-arrest statements be **DENIED**, and these statements be **ADMITTED**.

## DEFENDANT CHAVEZ-MACIEL'S PRELIMINARY MOTION TO SEVER DEFENDANTS

Chavez-Maciel filed a preliminary motion to sever the trial of the defendants in this case, pursuant to <u>Bruton v. United States</u>, 391 U.S. 123 (1968),[10] to the extent that any of his co-defendants have made statements that refer to or implicate him, and on the ground that his co-defendants may raise defenses at trial that are antagonistic to him.

Rule 8(b) of the Federal Rules of Criminal Procedure allows for joinder of defendants where "an indictment charges multiple defendants with participation in a

---

[10] In <u>Bruton</u>, the Supreme Court held that post-arrest statements made by non-testifying co-defendants that incriminate other defendants are inadmissible into evidence because such statements violate the other defendants' Sixth Amendment rights to confront and cross-examine adverse witnesses. <u>Id.</u>, 391 U.S. at 126. The Supreme Court concluded that "where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial," limiting instructions by the court will not suffice to eliminate the prejudicial effect of the introduction of such statements. <u>Bruton</u>, 391 U.S. at 135-36.

single conspiracy and also charges some but not all of the defendants with substantive counts arising out of the conspiracy." United States v. Alvarez, 755 F.2d 830, 857 (11th Cir. 1985); see also Fed. R. Crim. P. 8(b). "[T]he general rule is that [d]efendants indicted together should be tried together, especially in conspiracy cases." United States v. Chavez, 584 F.3d 1354, 1359-60 (11th Cir. 2009); Alvarez, 755 F.2d at 857. On the other hand, Rule 14 of the Federal Rules of Criminal Procedures provides:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a). When a court is confronted with a motion to sever, the court must "balance any . . . prejudice [to the defendants] against the interest of judicial economy." United States v. Blankenship, 382 F.3d 1110, 1120 (11th Cir. 2004) (internal quotation marks and citation omitted). The Supreme Court has established a two-step test to determine whether a court should grant a motion to sever: (1) the defendant must first show that a joint trial will prejudice him; and (2) the defendant must also demonstrate that less drastic measures will not suffice. United States v. Browne, 505 F.3d 1229, 1268 (11th Cir. 2007) (citing Zafiro v. United States, 506 U.S. 534, 539 (1993), and Blankenship, 328 F.3d at 1122)). Although rare, prejudice may be shown: (1) where the defendants rely upon mutually antagonistic defenses; (2) where a co-defendant would exculpate the moving defendant in a separate trial, but will not testify in a joint trial; (3) where inculpatory evidence will be admitted against one defendant

29

that is not admissible against another defendant; and (4) where a cumulative and prejudicial "'spill over'" effect may prevent the jury from making an individualized determination as to each defendant based on the evidence presented. Chavez, 584 F.3d at 1360-61.

Here, Chavez-Maciel anticipates that his co-defendants may raise antagonistic defenses at trial. Generally speaking, "where co-defendants have mutually exclusive defenses, a severance is rarely the remedy." United States v. Repke, No. 1:10-CR-524-ODE-RGV, 2011 WL 1325610, at *6 (N.D. Ga. Mar. 11, 2011) (internal quotation marks and citation omitted); see also Chavez, 584 F.3d at 1360. "[T]o justify severance . . . joined defendants must show that the conflict [inherent in multi-defendant trials, in which co-defendants often blame each other to deflect guilt from themselves or to lessen their own culpability,] is of such magnitude that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." Repke, 2011 WL 1325610, at *6 (internal quotation marks and citations omitted). Chavez-Maciel has not met this burden. Chavez-Maciel fails to set forth his defense(s) or the defense(s) of his co-defendant(s) who are proceeding to trial and fails to explain how these defenses conflict or how he would be prejudiced from a joint trial. Accordingly, the undersigned **RECOMMENDS** that Defendant Chavez-Maciel's Motion to Sever on the basis of antagonistic defenses be **DENIED**. See id. at *6-7 (recommending defendant's motion to sever on the basis of antagonistic defenses be denied because defendant "failed to specify the nature of his defense, the defense of his co-defendant, how these defenses

30

conflict, or how he would be prejudiced from a joint trial"); <u>United States v. Zellner</u>, No. 1:09-CR-320-TCB-GGB, 2011 WL 530718, at *9 (N.D. Ga. Jan. 14, 2011) (recommending defendant's motion to sever on the basis of antagonistic defenses be denied because defendant "presented no evidence of antagonistic defenses"). Should mutually exclusive defenses develop at trial, the appropriate solution is a limiting instruction from the trial judge. <u>Blakenship</u>, 382 F.3d at 1125 n.27.

With respect to the <u>Bruton</u> issue, Chavez-Maciel claims that at least two of his co-defendants have made statements implicating him. However, since the filing of his preliminary motion, Chavez-Maciel has not described the alleged inculpatory statements, identified which co-defendant(s) made the statements, or indicated whether such co-defendant(s) are going to trial or have pled guilty. As such, the undersigned is unable to evaluate Chavez-Maciel's motion or any remedial efforts the Government may plan to undertake to avoid a <u>Bruton</u> problem. Accordingly, the undersigned **RECOMMENDS** that Defendant Chavez-Maciel's Motion to Sever Defendants be **DEFERRED** to the District Court on this issue. <u>See</u> <u>United States v. Bushay</u>, 859 F. Supp. 2d 1335, 1383 (N.D. Ga. 2012) (magistrate judge deferred motion to sever to district court because defendant's motion did not state which co-defendants made implicating statements nor did it state whether such co-defendants were going to trial or had pled guilty).

AO 72A
(Rev.8/82)

## DEFENDANT CHAVEZ-MACIEL'S MOTION FOR DISCLOSURE OF CONFIDENTIAL INFORMANTS

Chavez-Maciel moves for the production of the name, address, and other identifying information and the location of the primary confidential informant ("CI-1") in this case.[11] By written motion, Chavez-Maciel argues that the disclosure of CI-1's identity and location is important to his motions to suppress wiretaps, GPS and cell cite data, and pen registers, which were largely based on information obtained from CI-1, and his defense to these accusations at trial. By oral motion in Chavez-Maciel's in camera hearing before the Court, Chavez-Maciel further argued for the disclosure of CI-1's identity and location because Chavez-Maciel contends the Government's agents relied upon CI-1 to assist with interpreting his conversations, and therefore he needs to be able to confront this witness.

In Roviaro v. United States, 353 U.S. 53 (1957), the Supreme Court recognized that the government has a limited privilege to withhold the identity of its informants from disclosure. Id, 353 U.S. at 59-60. As the Roviaro court explained:

> The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

Id. at 59. However, if the disclosure of the informant's identity is "relevant and helpful

---

[11] There are two confidential informants ("CI") in this case. A second CI ("CI-2") played a role on only one occasion during the investigation and did not provide any information about Chavez-Maciel.

to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." Id. at 60-61. To determine when the privilege must give way, the Roviaro court established a balancing test between "the public interest in protecting the flow of information against the individual's right to prepare his trial," whereby a court must examine "the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." Id. at 62. The Eleventh Circuit has focused on three factors in particular: "(1) the extent of the informant's participation in the criminal activity, (2) the directness of the relationship between the defendant's asserted defense and the probable testimony of the informant, and (3) the government's interest in non-disclosure." United States v. Tenorio-Angel, 756 F.2d 1505, 1509 (11th Cir. 1985) (internal citations omitted).

1. Extent of the Informant's Participation in the Alleged Criminal Activity

Although CI-1 was very involved in communications with Chavez-Maciel, this first factor does not demand disclosure. In general, the greater the informant's level of participation in the criminal activity, the greater the need to disclose the informant's identity. United States v. Ayala, 643 F.2d 244, 246 (5th Cir. 1981). The Government acknowledges that CI-1 had substantial involvement in communicating with Chavez-Maciel during the investigation of this case. Consequently, CI-1 does not qualify as being merely a tipster, such that the question of disclosure is easily resolved

33

in favor of non-disclosure. See United States v. Diaz, 655 F.2d 580, 587 (5th Cir. 1981) (recognizing that the Roviaro principle does not require disclosure of a mere tipster's identity). On the other hand, CI-1's communications with Chavez-Maciel were not exclusive. Aside from two or three brief telephone calls, CI-1 was in the presence of or was otherwise monitored by federal agents, who can testify to all of the conversations of CI-1 and Chavez-Maciel. Therefore, the facts of this case are not wholly analogous to Roviaro, such that disclosure of CI-1's identity would be required because CI-1 was the sole participant in the transaction charged other than the accused. See Roviaro, 353 U.S. at 64-65. Because other federal agents were present who can testify from personal knowledge about CI-1's communications with Chavez-Maciel, CI-1's substantial involvement in the communications with Chavez-Maciel does not mandate disclosure. See United States v. Gutierrez, 931 F.2d 1482, 1491 (11th Cir. 1991) (noting that the government's informant's substantial involvement in the case did not weigh in favor of disclosure because the informant was always with a government agent who could testify to everything that occurred, with the exception of a few instances in which no government agent was present).

        2.    The Directness of the Relationship Between Chavez-Maciel's Asserted Defense and the Probable Testimony of CI-1

Next, this Court turns to the correlation of Chavez-Maciel's asserted defenses to CI-1's probable testimony. The burden is on the defendant to "show that the informant's testimony would significantly aid in establishing an asserted defense." Tenorio-Angel,

34

756 F.2d at 1511 (citing Diaz, 655 F.2d at 588). Mere conjecture about the possible relevance of CI-1's testimony is insufficient to compel disclosure. United States v. Kerris, 748 F.2d 610, 614 (11th Cir. 1984); Ayala, 643 F.2d at 247. In Chavez-Maciel's motion, he argues for the disclosure of CI-1's identity and location because Chavez-Maciel contends the information is important to his motions to suppress evidence obtained from wiretaps, pen registers, and the GPS tracking device. However, as discussed below, Chavez-Maciel does not have standing to contest the wiretaps or the GPS tracking device. Additionally, Chavez-Maciel voluntarily withdrew his motion to suppress evidence obtained from the pen registers. (See Docket Entry [120]). As such, Chavez-Maciel's request for disclosure of the identity and location of CI-1 for purposes of these motions is moot.

In Chavez-Maciel's in camera hearing, he also argued that the disclosure of CI-1's identity and location are necessary because CI-1 translated Chavez-Maciel's communications. However, as noted above, other than at most three brief conversations, all of the communications between CI-1 and Chavez-Maciel were observed or monitored by federal agents. The federal agents and other government employees working with the agents were able to translate Chavez-Maciel's communications without assistance from CI-1. Therefore, disclosure is not mandated under this factor.

### 3.  Government's Interest in Non-Disclosure

The last factor to consider is the Government's interest in non-disclosure. "The government's interest may be proven by showing that disclosure might endanger the

AO 72A
(Rev.8/82)

informant or other investigations." <u>Tenorio-Angel</u>, 756 F.2d at 1509 (internal citation omitted). In an in camera hearing before this Court, the Government clearly established that CI-1 has been very useful to a number of the Government's investigations, including ongoing investigations. The Government also has established that there is a credible threat of danger to CI-1 and CI-1's family both here in the United States and abroad. Disclosing CI-1's identity, even in a controlled or limited manner, could jeopardize ongoing law enforcement efforts and CI-1 and CI-1's family's well being. Thus, this last factor also weighs in favor of non-disclosure.

Accordingly, the undersigned **RECOMMENDS** that Defendant Chavez-Maciel's Motion for Production of Name and Location of Confidential Informants be **DENIED**.

## DEFENDANT CHAVEZ-MACIEL'S MOTION TO SUPPRESS INTERCEPTED COMMUNICATIONS

Chavez-Maciel moves to suppress evidence obtained via several wiretaps on the ground that the individual affidavits supporting the wiretap applications fail to meet the requirements of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2521 ("Title III"). In response, the Government challenges Chavez-Maciel's standing to bring the motion. Chavez-Maciel replies that he has standing to contest the wiretaps as an aggrieved person pursuant to 18 U.S.C. § 2511 on three grounds. First, "Picho," the Government's alias for Chavez-Maciel, is listed as a target subject on the wire intercept applications filed by the Government. Second, the Government alleges that one of the many voices captured in the intercepts is Chavez-

36

Maciel's. Third, Chavez-Maciel was a party to intercepted communications on the target telephones as evidenced by the wiretap applications that show "Jose Luis a.k.a. Picho" as a participant.

"Title III, enacted by Congress as part of the Omnibus Crime Control and Safe Streets Act of 1968, establishes a rigorous regime that the Government must follow to intercept the contents of any wire or oral communications." United States v. Cook, No. 1:11-CR-218-TWT-CCH, 2011 WL 7767741, at *3 (N.D. Ga. Nov. 22, 2011); see also 18 U.S.C. §§ 2510-2521. Under Title III, only an "aggrieved person" may move to suppress wiretap evidence. 18 U.S.C. § 2518(10)(a). An "'aggrieved person'" is one "who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). This statutory definition has been "construed in accordance with existing standing rules" for Fourth Amendment claims. Alderman v. United States, 394 U.S. 165, 176 n.9 (1969). "'Generally, to establish standing the movant must show that (1) he was a party to the communication, (2) the wiretap efforts were directed at him, or (3) the interception took place on his premises.'" United States v. Chaidez-Ontiveros, No. 1:11-CR-0264-AT-JFK, 2011 WL 7574634, at *5 (N.D. Ga. Oct. 25, 2011) (quoting United States v. Faulkner, 439 F.3d 1221, 1223 (10th Cir. 2006)). Defendant bears the burden of establishing standing. Chaidez-Ontiveros, 2011 WL 7574634, at *5; United States v. Degaule, 797 F. Supp. 2d 1332, 1352 n.14 (N.D. Ga. 2011); United States v. Ortega-Estrada, No. 1:07-CR-356-TWT, 2008 WL 4716949, at *2 (N.D. Ga. Oct. 22, 2008)

37

(same). "[A] defendant cannot rely on the Government's position, contention or theory to establish standing and must instead prove his expectation of privacy as to a particular search, including, that he is an 'aggrieved person' under the Act." Chaidez-Ontiveros, 2011 WL 7574634, at *6; see also United States v. Bell, 218 F. App'x 885, 895 (11th Cir. 2007) (concluding that defendant, who testified at the suppression hearing that he was not the leaseholder of the apartment searched, "cannot adopt the government's evidence" that he did lease the apartment "for the limited purpose of establishing standing while challenging the validity of this same evidence.").

In this case, Chavez-Maciel attempts to establish that he is an "aggrieved person" by relying on the fact that "Picho," the Government's alias for him, is listed as a target subject on all of the wire intercept applications the Government filed and the Government alleges his voice is one of many voices captured in the intercepts. Chavez-Maciel also provides transcripts of calls intercepted on May 30, 2010, August 23, 2010, and October 21, 2010, along with line sheets that either list "Picho" as the target or list "Jose Luis Chavez a.k.a. Picho" as a participant on the call. (Docket Entries [129-1, 129-2, 129-3]). All of the evidence, upon which Chavez-Maciel relies, is nothing more than the Government's theory that Chavez is "Picho." Chavez-Maciel has not presented any evidence establishing that he is "Picho," he was an actual target of the wiretaps, or he was intercepted on the wiretaps.

Chavez-Maciel argues that based on United States v. Cruz-Aguirre, No. 1:08-CR-488-7-JEC-ECS, Docket Entry [232] (N.D. Ga. Aug. 25, 2009), there is no authority for

38

the Government's position that he must affirmatively identify himself "Picho" where other probative evidence tends to establish that it is his voice on the wiretaps. However, Chavez-Maciel's reliance on Cruz-Aguirre is misplaced. The record evidence in Cruz-Aguirre reflected that "Quicho," the Government's alias for the defendant, was listed as a named interceptee for two target telephones, and "Quicho" was listed on the Government's line sheets as an individual intercepted on calls on a third target telephone. (Docket Entry [232], p. 2). The defendant also relied upon a report of the Government's analysis of the defendant's voice which, through comparison to the wiretaps, established the defendant's voice as that of "Quicho's." (Id.)

Distinct from the defendant in Cruz-Aguirre, Chavez-Maciel has not pointed any evidence of his own or of the Government that conclusively establishes that he is in fact "Picho." Chavez-Maciel merely speculates that if the Government's agents were subpoenaed, their subjective testimony would establish that he is "Picho." This is insufficient to confer standing on Chavez-Maciel to challenge the wiretap admissions. See Chaidez-Ontiveros, 2011 WL 7574634, at *6 (concluding the defendant failed to establish standing because the defendant simply relied upon the Government's belief that the defendant and "Loco" were the same person, without making any assertion that he in fact was "Loco," that his voice was in fact intercepted on a target telephone, or that the wiretap was directed at him); Ortega-Estrada, 2008 WL 4716949, at *2 (defendants who "elected not to identify their ownership or control of a Target Telephone or a conversation that they had on any of the Target Telephones" failed to establish standing

39

to suppress wiretaps); cf. Cook, 2011 WL 7767741, at *2 (N.D. Ga. Nov. 22, 2011) (concluding that defendant, who admitted in his brief to having had conversations that were intercepted, had standing to challenge wiretaps); United States v. Acosta, 807 F. Supp. 2d 1154, 1234 & n.65 (N.D. Ga. 2011) (noting that defendant, who presented an affidavit in which "he stated under oath that his voice was intercepted on at least one telephone call on each of the identified target telephones" was found to have established that he was an "aggrieved person" under Title III); Ortega-Estrada, 2008 WL 4716949, at *2-3 (defendants who submitted sworn affidavits indicating that their calls were intercepted on certain target telephones or that they owned a target telephone that was intercepted established standing to contest wiretaps).

Because Chavez-Maciel does not have standing to challenge the wiretaps, this Court need not address the merits of his argument about the deficiencies in the wiretap affidavits. Accordingly, the undersigned **RECOMMENDS** that Defendant Chavez-Maciel's Motion to Suppress Intercepted Communications be **DENIED**.

## DEFENDANT CHAVEZ-MACIEL'S MOTION TO SUPPRESS EVIDENCE RESULTING FROM UNLAWFUL SEARCH WARRANTS FOR INSTALLATION OF GPS TRACKING DEVICE

Chavez-Maciel moves to suppress evidence obtained from a GPS tracking device installed on a silver Honda Accord. According to Chavez-Maciel, the three search warrants that authorized the installation of the GPS tracking device were not based on probable cause because the supporting affidavits failed to establish that the confidential informant, upon whom the agents relied, was reliable and truthful. Chavez-Maciel also

40

contends that the second and third search warrants should be suppressed because the agents failed to establish that the evidence from the initial 30-day tracking period warranted extensions of the initial warrant. Lastly, Chavez-Maciel seeks suppression of the evidence based on the Government's failure to timely return the warrant and give him notice after use of the tracking device ended.

Before addressing the merits of Chavez-Maciel's arguments, the Government challenges whether Chavez-Maciel has standing to contest the GPS tracking device installed on the Honda Accord. According to the Government, a warrant was issued to obtain information on the movements and locations of an automobile described as follows:

> One 1998 silver Honda Accord, bearing Georgia license plate number 2493 AHM and Vehicle Identification Number (VIN) 1HGCG5650WA179119, registered to KENYA KALIA HILL, 791 Marstevan Drive, N.E., Apartment A, Atlanta, GA 30306, and believed to be used by FNU LNU, a/k/a Picho.

(Gov't's Br., Docket Entry [124], p. 2). The Government argues that Chavez-Maciel has not presented any evidence to show that he owns the Honda Accord or that he used the Honda Accord such that he had a legitimate expectation of privacy in the vehicle.

Chavez-Maciel replies that there are documents from the agents investigating this case, who were present for telephone calls between "Picho" and a confidential source regarding the Honda Accord. According to the agents, "Picho" and the confidential source arranged to meet so that "Picho" could give the Honda Accord to the confidential source to have a hidden compartment located next to the gas tank fixed; "Picho" picked

41

up the Honda at the place where the agents dropped it off after the repairs were made; and the agents believe Chavez-Maciel to be "Picho." Chavez-Maciel contends that it is clear that he had custody and control of the Honda Accord because the agents reported that he was directing the repairs that needed to be made, he arrived at the initial meeting place with the Honda Accord behind him, and he picked up the car at the point where agents dropped it off. Chavez-Maciel proffers that he would subpoena the Government's witnesses at a suppression hearing who, upon information and belief, would establish that they believe he is "Picho."

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To challenge a search on Fourth Amendment grounds, a party must demonstrate that he has a legitimate expectation of privacy in the searched area. Rakas v. Illinois, 439 U.S. 128, 142-43 (1978); United States v. McBean, 861 F.2d 1570, 1573 & n.7 (11th Cir. 1988). "A person has a legitimate expectation of privacy if (1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable." United States v. Harris, 526 F.3d 1334, 1338 (11th Cir. 2008) (internal citation omitted). The Eleventh Circuit has recognized that the driver of a borrowed vehicle has standing to challenge a search under the Fourth Amendment. See United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998); United States v. Miller, 821 F.2d 546, 548 (11th Cir. 1987). The defendant bears the burden of proving that he has standing to contest a search on Fourth Amendment grounds. Rakas,

439 U.S. at 130 n.1; Cooper, 133 F.3d at 1398.

As an initial matter, the Honda Accord is not registered in Chavez-Maciel's name, nor has Chavez-Maciel introduced any evidence that he legitimately borrowed the vehicle from its owner. Furthermore, here again, Chavez-Maciel attempts to establish standing based on the Government's theory and no evidence of his own. However, even the Government's evidence that Chavez-Maciel does provide is insufficient to demonstrate that he has standing. Chavez-Maciel presents a four-page Department of Homeland Security ICE Report of Investigation dated March 3, 2010, which chronicles the involvement of "Picho" with the Honda Accord. (Docket Entry [130-1]). Chavez-Maciel is not mentioned by name anywhere in the report. Absent evidence that "Picho" and Chavez-Maciel are the same person, this ICE report does not support Chavez-Maciel's standing claim. Consequently, Chavez-Maciel has failed to establish that he has standing to challenge the installation of the GPS tracking device.

Because Chavez-Maciel does not have standing to challenge the installation of the GPS tracking device, this Court need not address the merits of Chavez-Maciel's argument about the substantive and procedural deficiencies in the underlying search warrants. Accordingly, the undersigned **RECOMMENDS** that Defendant Chavez-Maciel's Motion to Suppress Evidence Resulting from Unlawful Search Warrants for Installation of GPS Tracking Device be **DENIED**.

AO 72A
(Rev. 8/82)

## DEFENDANT CHAVEZ-MACIEL'S PRELIMINARY MOTION TO SUPPRESS IDENTIFICATIONS

Chavez-Maciel preliminarily moved to suppress two out-of-court identifications that he argued may be presented at trial. On August 3, 2012, the undersigned ordered Chavez-Maciel to either perfect his preliminary motion to suppress the out-of-court identifications within fourteen (14) days of the Court's Order or to advise the Court as to whether this motion could be withdrawn. Docket Entry [308]. To date, Chavez-Maciel has not perfected this motion, nor has he indicated that he wishes to withdraw this motion. Chavez-Maciel also did not discuss the out-of-court identifications in the January 9, 2012 evidentiary hearing. (See Docket Entry [295]). Because Chavez-Maciel failed to perfect the motion, the undersigned concludes that he has abandoned this motion to suppress. Accordingly, the undersigned **RECOMMENDS** that Defendant Chavez-Maciel's Preliminary Motion to Suppress Identifications be **DEEMED ABANDONED** and be **DENIED**. United States v. Elder, No. 1:10-CR-132-RWS/AJB, 2010 WL 5656687, at *3 (N.D. Ga. Dec. 16, 2010) ("By failing to perfect the motion, the undersigned concludes that [defendant] abandoned his motion to suppress); United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1327 n. 3 (N.D. Ga. 2009) ("Defendant has not perfected the motion [to suppress], and it is deemed abandoned and withdrawn."); United States v. Shorr, No. 1:07-cr-182-1-TWT, 2008 WL 655994, at *1 (N.D. Ga. Mar. 10, 2008) (deeming preliminary motion to suppress abandoned because defendant failed to perfect the motion).

AO 72A
(Rev.8/82)

## CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** the following:

(1)    Defendant Chavez-Maciel's Preliminary and Perfected Motions to Suppress Evidence and Statements be **GRANTED IN PART AND DENIED IN PART**, (Docket Entries [97, 102, 299]);

(2)    Defendant Chavez-Maciel's Preliminary Motion to Sever Defendants be **DEFERRED** as to the <u>Bruton</u> issue and **DENIED** as to the antagonistic defenses argument, (Docket Entry [100]);

(3)    Defendant Chavez-Maciel's Motion for Production of Name and Location of Confidential Informants be **DENIED**, (Docket Entry [101]);

(4)    Defendant Chavez-Maciel's Preliminary and Perfected Motions to Suppress Intercepted Communications be **DENIED**, (Docket Entries [103, 118]);

(5)    Defendant Chavez-Maciel's Preliminary and Perfected Motions to Suppress Evidence Resulting from Unlawful Search Warrants for Installation of GPS Tracking Device be **DENIED**, (Docket Entries [105, 119]); and

(6)    Defendant Chavez-Maciel's Preliminary Motion to Suppress Identifications be **DEEMED ABANDONED** and **DENIED**, (Docket Entry [107]).

There are no further motions or problems pending before the undersigned to prevent the scheduling of this Defendant for trial. Therefore, this Defendant is

45

**CERTIFIED READY FOR TRIAL.**[12]

> **IT IS SO ORDERED AND REPORTED AND RECOMMENDED**, this  7th

day of December, 2012.

<div style="margin-left:40%">

s/Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

</div>

---

[4]This Court observes that Defendant Chavez-Maciel has been indicted with additional defendants and that matters pertaining to one co-defendant is still pending. Pursuant to the Speedy Trial Act, 18 U.S.C. § 3161(h)(7), the time for commencing Defendant's trial may be stayed until such time as all other defendants have been certified ready for trial. Hence, it is not necessary to place the above-named Defendant's case on the calendar for trial at this time.

AO 72A
(Rev.8/82)